LYNN, Administrator, Respondent, v. SCHIRBER, Appellant.

(184 N. W. 978.)

(File No. 4899.   Opinion filed November 4, 1921.)

1. **Damages—Conversion of Government Bonds—Verdict Embracing Face Value, Whether Exemplary Damages Shown—Evidence Presumptive Value of Bonds, Judicial Notice Re.**

   In a suit to recover exemplary damages based upon alleged fraud in conversion of certain personalty of plaintiff's decedent, including government bonds, held, that the objection that an instruction concerning exemplary damages was prejudicial as unwarranted by evidence, and that size of verdict showed it included exemplary damages, is untenable, that in absence of evidence as to value of the bonds, it will be presumed they were of their face value, and might be so considered by jury. Held, further, that if court should take judicial notice of market value of bonds, it would take judicial notice that they were worth at least enough to compel jury to render verdict as large as that rendered, even without allowing exemplary damages.

2. **Contracts—Mental Competency to Make, Physical Weakness As Evidence of Incompetency—Sufficiency of Evidence, Substantially Supporting Verdict, Effect.**

   Where in a suit for damages for fraudulent conversion of personalty, the claim is based upon the mental incompetency of plaintiff's decedent, held, there being substantial evidence supporting the verdict for plaintiff, court will not inquire into question of weight of evidence; this in view of fact that trial court, who, as well as jury, saw and heard witnesses testify, denied a new trial.

3. **Contracts—Decedent's Bill of Sale and Deed of Realty to Defendant Immediately Prior to Death, Latter's Agreement to Support Decedent, Pay Debts, Etc.—Unreasonableness of Contract, Discrepancy Between and Decedent's Oral Instructions, as Evidence of Incompetency—Verdict Sustaining Incompetency Approved.**

   Where plaintiff's decedent, almost immediately prior to his death, is alleged to have executed a bill of sale to defendant of some $12,000 worth of personalty, and to have executed a deed of his homestead to him and to have entered into an agreement with him under which defendant undertook in consideration of said conveyances to see that, out of proceeds of the property, decedent was cared for during life, debts and funeral expenses paid, and out of what might remain certain

payments to be made to one R and one W and that the homestead should be conveyed to R; held, that the strongest evidence of decedent's mental incompetency in making the contract, and from which jury might well have inferred his incapacity, was the relationship of decedent to defendant (the latter not being decedent's relative but being an officer in a bank in which decedent deposited funds), the unreasonableness of the agreement, and discrepancies between its conditions and the instructions given by decedent to defendant; R and W having cared for decedent in his last sickness, and he having expressed gratitude for what they had done for him; the oral instructions to defendant being that Mrs. R should receive the homestead and personal property and $1000 in money, that W should receive $500, that "the expense there might be or the debts he might have, were to be paid," that he should have decent burial, etc., he having stated he did not want to leave anything to a brother and sister, that he believed those who cared for him should have what he had or the benefit of it, he having stated to defendant that any money that was left he was to keep; it being clear that decedent's intention was that Mrs. R should have the property indicated in consideration of what she had done, and likewise as to W; while the writing was on condition that nothing whatever would go to Mrs. R until decedent's death, and even then nothing but reasonable compensation for what she had done unless she continued to perform duties his lifetime services mentioned—the very thing which was to be virtually the sole consideration for over $10,000 coming to defendant; and verdict for plaintiff upon theory of decedent's incompetency was amply sustained by evidence.

McCoy, J., not sitting.

Appeal from Circuit Court, Campbell County    Hon. JOSEPH H. BOTTUM, Judge.

Action by George W. Lynn, Administrator of the Estate of John F. Nicholson, against Martin J. Schirber, to recover value of property belonging to said decedent alleged to have been unlawfuly converted by Defendant. From a judgment for Plaintiff, and from an order denying a new trial, Defendant appeals. Affirmed.

A. A. Brown, and Campbell & Walton, for Appellant.

A. H. Wells, and Lynn & Lynn, for Respondent.

(1)  To point one of the opinion, re value of bonds, Respondent cited: Abbott's Proof of Facts, p. 877, Sec. 9; Conrad v. Bunker, 2 S. D. 294.

WHITING, J.  This is an action brought to recover the
value of certain property alleged to have been unlawfully con-
verted by defendant.  Trial was had before the court and jury,
and verdict and judgment were for plaintiff.  Defendant has ap-
pealed from the judgment and from an order denying a new
trial.

The property in question had formerly been the property of
one Nicholson, and had all been taken into the possession of de-
fendant just prior to Nicholson's death, some of it prior to the
execution of the agreement hereafter referred to.  Respondent is·
the administrator of Nicholson's estate.  Appellant admits that he
took such property into his possession and had converted it to
his own use, but he attempts to justify his actions because of an
alleged bill of sale of this property to him.  Respondent does not
concede that Nicholson ever executed this bill of sale, and con-
tends that, if it was executed by him, that he was mentally in-
competent to understand the nature of what he was doing, and,
further, that its execution was procured through fraud.

[1]  Respondent sought exemplary damages, basing such
claim on the alleged fraud.  Appellant complains of an instruction
in relation to exemplary damages, contending that such instruc-
tion was not warranted by the evidence, and that it was preju-
dicial, he contending that the size of the verdict shows that it
included exemplary damages.  Appellant is wrong in this last
contention.  The only basis upon which such contention is based
is that the jury had no right, in arriving at its verdict, to take
into consideration certain government bonds that appellant had
converted.

Appellant contends that there was no evidence as to the value
of these bonds, and that therefore they could not be considered
by the jury.  Without evidence as to value, it would be presumed
that they were of their face value.  Appellant says, however, that
this court must take judicial notice that these bonds were not
worth par.  There is nothing showing what issue of bonds these
were; but, if this court should take judicial notice of the market
value of same, it would take judicial notice that they were worth
at least enough to compel the jury to render a verdict as large as
the one rendered if their verdict was for respondent; and this
without allowing exemplary damages.

[2]  Nicholson was some 71 years of age.  He owned the home in which he lived, the household goods therein, several certificates of deposit for money deposited by him in the bank of which appellant was an officer, several government bonds, quite a sum of cash, and a few small notes of little or no value.  In all, he had something over $12,000 of personal property in cash, bonds, and certificates, the amount of which was fully known to appellant when the conveyances hereinafter referred to purport to have been made.  He is alleged to have conveyed his home to appellant by deed and his personal property to appellant by bill of sale, and to have entered into a written agreement with appellant wherein appellant undertook, in consideration of said conveyances, to see that, out of the proceeds of this property, he was cared for during life, and his debts and funeral expenses paid; to see that, out of what might then be remaining, certain payments should be made to one Mrs. Rische and one Warschawsky, and that the home was conveyed to Mrs. Rische.  The main question before us is whether there was evidence to sustain a finding that Nicholson was incompetent to understand the nature and effect of the transaction evidenced by these three instruments, admitting he executed same.  Appellant contends that, at best, the evidence merely showd Nicholson to be physically weak, and that mere weakness is not, in and of itself, evidence of mental incompetency; and that therefore there was absolutely no evidence of mental incompetency.  Respondent, while conceding the law to be as above stated, contends that mental incompetency may result from physical weakness, and that, in this case, there was evidence sufficient to warrant the jury in concluding that this very sick man had become mentally incompetent to understand the nature and effect of this whole transaction.  Under the established law of this state, if there was substantial evidence supporting this verdict, it is not for this court to inquire into the question of the weight thereof; and this is especially true in view of the fact that the trial court, who, as well as the jury, saw the witnesses and heard them testify, has seen fit to deny a new trial.

[3]  No good purpose would be subserved in making a detailed statement of the evidence which we deem warrants the verdict.  There was evidence showing that Nicholson, at the time he executed these instruments, had been sick for several months;

and that, for a few days just prior to the execution of such instruments, he had become much worse, and was in more or less of a stupor a large part of the time, only, as a rule, answering questions that could be answered by yes or no, and showing little understanding of what was being said or done. He died early Wednesday morning. While appellant testifies that, some considerable time prior to his death, Nicholson advised him that he wished him to draw up some papers for him, yet it was not earlier than Friday evening before his death, and when he was admittedly very sick and weak, that appellant claims to have learned that it was the desire of Nicholson to turn over his property in consideration of appellant's agreeing to see that he was cared for during his life-time. Appellant claims that conversations in relation to the disposition of Nicholson's property were had on Friday, Saturday, Sunday, and, lastly, on Monday, the writings themselves being executed some time during Monday afternoon, about 36 hours before Nicholson died.

In our opinion, the strongest evidence of the mental incompetency of Nicholson, and evidence from which the jury might well infer that he was incapable of understanding and did not understand the nature and effect of the instruments executed by him, is the relationship of Nicholson to appellant and to certain other parties, the unreasonable provisions of the written agreement, and the discrepancies between the conditions of such agreement and the instructions which appellant testified were given to him by Nicholson. The only relationship existing between Nicholson and appellant, so far as the testimony shows, was that commonly existing between an officer of a bank and a patron of such bank. There were no social relations existing between them. Appellant had not, so far as the evidence shows, personally cared for Nicholson during this last sickness. Mrs. Rische lived in Nicholson's home, and had been the one who had mainly cared for him. Warschawsky and wife had taken deep interest in Nicholson, had kept watch over his condition during his sickness, had visited him often; and Warschawsky had sat up with him nights during his later sickness. Nicholson expressed deep gratitude for what Mrs. Rische and Warschawsky had done for him. Appellant, after testifying to the four different days upon which he conversed with Nicholson in relation to the terms of the

·prospective agreement, testified that Nicholson directed him that ·"Mrs. Rische should receive the house and lot where he lived, and his personal property, and $1,000 in money;" that "Warschawsky was to receive $500;" that "the expense there might be or the debts he might have were to be paid;" that "he was to have a decent burial, and a tombstone erected on his grave; that he also mentioned the fact that appellant "could probably arrange to have him taken care of at Redfield, at a home of the feeble;" that, when he was asked if he wanted to leave anything to his relatives (a brother and sister), he said "No," that he believed "those who take care of me should have what I have got, or should have the benefit of it;" and that, when he asked him what should be done with the money that was left, he said, "That goes to yourself. You keep that."

Defendant claims to have made a notation of all of these instructions, and that it is upon such notations that he drew the contract. He did not produce his notations, and he gave no other or further testimony as to the directions he received from Nichol-,son. From such directions, it is apparent that it was Nicholson's intention that Mrs. Rische should have the house, certain personal property, and the $1,000 in money, undoubtedly to be given her in consideration of what she had done for Nicholson. There was no suggestion or hint that Nicholson expected Mrs. Rische to continue to care for him as a condition to her receiving such property and money, or that she was to wait until Nicholson's death before receiving same. Under such directions, it would appear that Nicholson desired that Warschawsky should receive $500 for what he had already done, as there was no suggestion that he should wait for the same until the death of Nicholson. In view of such directions the jury might well have wondered why the deed to the home was not made directly to Mrs. Rische, the $1,000 and other personal property not transferred directly to Mrs. Rische, and the $500 not transferred directly to Warschawsky. The jury may well have inferred, from the fact that the instruments as drawn did not conform, in the above respects, with the instructions, that Nicholson did not comprehend the import of the instruments which he signed. But what is much more important and may have led the jury to believe that Nicholson did not comprehend the nature of the papers he was signing,

was the fact that, under the written agreement, the purposes expressed by Nicholson would not be carried out, even if appellant complied with the covenants of such agreement.

In such agreement, appellant covenanted that, "out of the property so turned over to him," he would provide proper care and necessities and all comforts reasonably possible during the remainder of Nicholson's life, and would pay "out of such property" all the expenses for such care, together with the debts owing to any one by Nicholson, and, after his death, provide a proper burial and have a monument erected. There was absolutely no covenant whereby appellant bound himself, in any way, to care for or provide for Nicholson after the proceeds of Nicholson's property had all been used in providing for his care. This feature of the agreement might have impressed the jury as being somewhat "jug-handled," and one which no sane man would execute when he was turning over to defendant over $12,000 worth of personal property, as well as a house and lot, and especially in view of the fact that there is no evidence that Nicholson was owing a dollar. What may have impressed the jury even more forcibly with the belief that Nicholson did not understand the import of the written agreement is the fact that, under such agreement, neither the house and lot, nor the $1,000, nor the other personal property, or any part thereof, was to be paid or turned over to Mrs. Rische, unless the house and lot and sufficient money were left at the time of Nicholson's death, it being provided that all this property should be first charged with the care of Nicholson, and with his debts and burial expenses, prior to its being charged with the payment of anything to Mrs. Rische; and, more monstrous than that, in the light of the instructions which appellant testified to, this written agreement, after speaking of this $1,000 and the home and the personal effects, which were to go to Mrs. Rische (if they all remained after Nicholson had died), contained the further provision in relation to all of this property:

"Which he shall give to her only in the event that she will take proper care of the party of the first part during his natural life; and should she not take proper care of the said party of the said first part during the remainder of his natural life, said party of the second part shall pay her only a reasonable sum for the time she did actually care for first party."

In other words, this writing was so conditioned that nothing whatever would go to Mrs. Rische until Nicholson's death, and even then nothing but a reasonable compensation for what she had done, unless she continued to perform, during the whole lifetime of Nicholson, the very thing which was to be the greater, if not the sole, consideration for over $10,000 coming to defendant. The writing also provided that the payment to Warschawsky, while it was to be made for what Warschawsky had already done for the first party, yet should not be made until after the death of Nicholson; this result being effected by a provision that the payments, both to Mrs. Rische and to Warschawsky, were to be made only in the event that enough property remained after Nicholson's death, and that, in case there was not enough property, the payments to Mrs. Rische and to Warschawsky were to be made pro rata. Certainly the jury had a right to believe that, when Nicholson put his cross to this agreement, if he ever did, he had no comprehension whatsoever of the terms thereof; it was not the agreement appellant had been instructed to prepare, and some of its provisions were such that no competent man, seeking to do justice between all the beneficiaries therein named, would have placed them therein.

The judgment and order appealed from are affirmed.

McCOY, J., not sitting.